Good morning, Your Honors, Jess Gag, it's Dean, Federal Defenders, on behalf of Mr. Jimenez. I'm going to try and reserve two minutes and I'll keep my eye on the clock, all right? And that said, with an eye to our limited time together, I'd like to answer, of course, any of this Court's questions, but focus on two things today. The first are the two expert errors and why they were serious and why they mattered in this case. And the second is the District Court's wrong legal analysis as to minor role and why remanding for resentencing under the new cases that came out after sentencing in this case would be the right approach. So first, the errors in admitting the two experts' testimony. Can I jump in really quick? Yes. So one of the things that I've been trying to figure out on the expert issues is the rule that applies. So let's assume there's error there. My understanding is that the harmless error standard in this context is, would the witness have been qualified as an expert? I think roughly yes. So Ruvalcalba-Garcia, I think, answers the question, what happens when an expert is inappropriately admitted as a lay witness? So is there any dispute here that these two agents could have been qualified as an expert if the government had disclosed them sufficiently in advance? There's no dispute as to their qualifications. There is dispute as to whether the substance of their testimony was reliable. Was there any argument below in the District Court about reliability of their evidence? Yes. So as to the forensic analyst, we objected both before and after his testimony under Rule 702, and then after his testimony at the end of the day discussing in more detail, we said at, let's see, 3 ER 556, the way he came about the numbers in this particular case, you know, one informant, three people that he talked to, and one publication, certainly doesn't seem like a large sample size or body of work. I had forgotten that. That's right. So that's the drug value expert. What about the forensic expert? Oh, I'm sorry. I'm sorry. I mixed up experts. Yeah. So as to the forensic analyst, I don't believe the government makes an argument that we didn't object there. We objected to his inclusion entirely on 702 grounds. And then as to reliability, the issue this court said in Ruvalcaba Garcia is that when the record is too sparse to conduct a proper admissibility argument on whether the information was reliable or not, this court reverses and remands. And so here, I think there's just not enough in the record to know whether the testimony was reliable as the forensic analyst in particular. But, okay. So I understand that argument, but you would agree that there, I went back and read the transcript early this morning. I didn't see any, there was the 702 objection for sure, but I didn't see anything to focus the district court on. We've got some reliability issues going on here. I think the 702 objection was enough. Just the generic 702 you think is enough? Yes. And I think that's how, I think both Valencia Lopez and Ruvalcaba Garcia, which make clear the explicit reliability findings issue in both those cases, when you read through the factual portion of the opinions, the objections there were very similar to the types of objections we made here. Well, the agent with respect to the drug quantity was Agent Lewenthal, correct? I believe that's correct. Yeah. And then Adasi, if I'm pronouncing the name correctly, was the forensic analyst, correct? Correct. Correct. Two entirely different analysis occur here with respect to those two matters. Correct. There's a, with respect to the drug quantity, there's no dispute the record reflects the amount of drugs involved were worth a substantial amount of money, whatever it would be, quite frankly. Yeah. They were a lot of drugs, for sure. And in terms of the drug quantity and whether or not that can, there need to be gatekeeper rule under Daubert is a totally different analysis between the drug quantity and the matter of the forensic analyst, correct? Yes. They're two different issues, but I think they both matter here. And so I think, I hear your concern with the drug value in particular, right? So on that issue, the government thought the specific value was important enough to open its opening, open its closing, mentioned it, I believe, eight times throughout the course of its closing, did not emphasize the weight of the drugs, but emphasize the value because it thought it mattered and was important independent evidence as to knowledge. So I do think on the prejudice issue, the specific value in this case really did matter. And if you look through the testimony, the value of the drugs was estimated to be substantially different between on the Mexico side versus the U.S. side. So while there's no doubt we're talking about kilograms of drugs, the value I think was, could be a wide range. The district court made a reliability finding initially as to the admissibility of the drug quantity evidence, essentially, whereas there's not necessarily any finding as to reliability as to the forensic analyst. So again, the reliability analyst analysis is different as to the two, isn't that correct as well? No, I don't believe the district court ever made a reliability finding as to either. Clearly the court did not, as to the forensic analyst, and I guess my point is, I'm trying to clarify as to the drug quantity, there was at least a reliability determination initially made when the court found that the testimony of Luenthal was admissible with respect to drug quantity. If so, only implicitly. There's no explicit reliability finding, and this court has made clear that implicit reliability findings are not enough. Can I go back to Agent Adassi, and I want to clarify, make sure I understand your position, because as I understand it, what he did is basically plugged it in, had, using the Cellebrite program, extracted the information, took the coordinates, plugged it into a map, and then read that. Are you saying that even that extraction and the process of figuring out the location, that that in and of itself requires for him to be qualified as an expert? As I'm sure you know, we have an unpublished dispositions, which is not binding. I understand that indicated that that sort of testimony does not require any particular expertise. So he did more than that here, and that's why I want to take it step by step and see if you're contesting, even the extraction and inputting of the location data, does that require expertise? And then we can talk about reliability and whether there's a sufficient preservation of an objection on reliability. Yes. So yes, I think here, because the extraction was from a hidden database, rather than just scrolling through text messages, for example, which is what this court has discussed in prior cases, it's one thing to do what any phone user could do, just through a fancy user software. Sure. And I think that's really the question. I didn't understand his testimony to really involve any explanation about the effectiveness of the program. I mean, I think one can challenge the program and how does the program work? Is it reliable? Can we trust this? And I think that's where the Daubert gatekeeping function really comes into play. But as I understand it, he didn't talk about the effectiveness of the program or reliability of such a method. You know, you plug it in, the program spits it out, setting aside program's reliability. He took the coordinates, put it into a map, and then testified about that. So it's not about the program. It's about the material in the phone that he captured, which was a hidden database that lay folks interacting with the phone would not be able to find, understand, or explain. So if I plugged it in, the same report wouldn't be spit it out? That seems to, that is what his testimony implies, in part because he describes what this specific database means, which is, I think he put it as taking digital code and putting it into a language. Yeah, he did. He did say that. He did say that. Right? He parsed and analyzed, interpreted, or whatever. Right, fancy language. But the way he testified is very much suggestive of some kind of expertise. But his description of the mechanics of what he did did not suggest any particular expertise to me. And that's why I wanted to clarify that. I see. And that's just because of the material. So a description of doing the same with text messages or with missed calls, anything that you or I could do, we're not arguing that that would be expert testimony. But why isn't, why isn't this somewhat similar to the doctor who runs the MRI? And he comes in and he testifies and he says, I saw this patient and I ran an MRI and this was the result. And we allow that as a fact witness. There's no discussion about MRIs and how they work and how reliable they are. It's just, I did this. I can't do that. I suppose that's a hidden database in a sense, right? Like I can't see inside somebody's body. Why isn't that the same? I think when it comes to describing the results of the MRI, I'm not sure that this court would allow that to be entirely lay testimony. I think as soon as you get into the description of, you know, here's what the data are, here's what they mean, that's when even someone who has, who's testifying as both a fact witness may also have to be qualified for the limited purpose of describing that opinion. And that would require reliability findings. So I don't. I can pick up on that. I don't mean to interrupt you. I'm sorry. No, no, please. Pick up on Judge Wynn's question, Judge Forrest's question. And I'll certainly be anxious to, as Mr. Zipf, this as well. Overwhelmingly, in the 10th, the 2nd, the 6th, the 5th, the 7th circuits, overwhelmingly, the matter of cell phone data and entering cell phone data and then coordinating that with the GPS coordinates and then locating where someone is in connection with it, all of these cases, all of them involve Rule 702 and expert testimony. Isn't that correct? Circuit after circuit in all the cases that I've, this is a very common practice on the part of the government with respect to proffering an expert who is qualified as an expert and explains, according to the record here, interpreting data stored in a database, as Judge Wynn has noted, but then it goes further. He then spoke as to how he translated the digital code into GPS coordinates. And then once it's in the GPS coordinates, then those coordinates are mapped out. And then that is coordinated to show proximity somewhere. Correct? That's correct. And that's the expertise. Yes. And that is what has been recognized by at least five or six different circuits in this country, from what I can tell. Yes. According to the brief. Isn't that correct? Yes, Your Honor. And I think the government, in this case, intended to do that. Intended to offer him as an expert and then was unable to do so. And then was permitted to do so under Rule 701 in the term of it being lay testimony. Correct. Okay. Because this is not, the facts of this case are not the least bit uncommon, based on your expertise. I mean, I know you're in this field as a public defender and I'm sure Mr. Zip can address this. But this is true in cases all around the country, with respect to cell phone data, the Jones case, the GPS coordinate case. I even know sitting as a trial judge in Maryland, the Graham case actually was a little different. That went up to the Fourth Circuit and was affirmed. But that was a little wrinkle where it was lay testimony. But my review, with respect to the number of cases, they're all in the context of Rule 702, whether it was appropriate expert opinion or not, or proper reliability inquiry. But none of them were in the context of Rule 701 and lay testimony, from what I can see. Yes. That's my understanding. The wrinkle in this case, of course, is that a lot of those cases concern text messages. Well, that's right. And also there are Fourth Amendment issues that come up as well in some of these cases. But the analysis in terms of putting the cell data and then translating that to GPS coordinates and then translating that to proximity and then doing the map, that's a fairly common practice from what I've seen. Absolutely. On minor role, I want to make sure I address this Court's questions on that point as well. I think the best line here is in light of the fact that both Dominguez-Caicedo and Rodriguez came out after sentencing, the best line is for this Court to remand for resentencing without any commentary as to the specifics for this district court to do it again. I think the record is pretty clear that he compared Mr. Jimenez to typical couriers, like the 20 or 30 he was sentencing a month, rather than to the unusual amount of information in this case as to the participants identified by the cooperator at trial. I mean, I guess I have one question about that. Reading the transcript, it does seem the district judge goes through all of the factors under sort of what I think is Part 2 of that test that the case has established. And in going through those factors, talks about the other people involved in this exercise. And then towards the end, makes these statements that you've pointed to about sort of the average courier or what couriers typically do. So why isn't the sort of longer, more developed discussion that's focused on the people involved in this particular enterprise not enough to meet what the case law says the district court needed to do? I don't believe the district court discussed the other folks in this enterprise when doing the minor role analysis in any sort of extent. But even putting that . . . He talked about like the nature and extent of your involvement, to the extent that you were a planner, to the extent that you got your benefit, and all those factors. And he's referencing people on the other side of the border, and how many times did he meet with them, and the back and forth that he was having. That's not with average people out in the world of drug trapping. It's the people in this particular operation. So putting that aside, I think the fact that the district court, I think, did reference typical couriers at several points. Because he did at the end, after he had talked about . . . So he referenced it in three of the factors as he was going through, as we lay out in our brief. And then at the end, he also says, and as to all other unlisted factors, I'm comparing you to these other typical couriers. And I think in light of that, I think it's hard to know what, you know, even to the extent he compared him to other identified participants by relying on all other unlisted factors, I think this court should remand for that reason. So I'll reserve my 15 seconds. You've got 15 seconds. I'll give you three minutes back. Thank you. May it please the court, Daniel Zip on behalf of the United States. I'll start with Judge Bennett's question. I think the distinction in those cases, so that's cases where we have a cell phone number for a defendant, and then sort of subpoena the carrier, T-Mobile or Sprint, whoever, and get the specific cell site data where that phone has been traveling. Each tower has three different directions, and you get pings on where it was. Very routine, is it not? Very routine. And that's... I mean, it's done all the time. Correct. And that's expert testimony. But that's not what we presented here. All that we presented here was Agent Adasi saying that he plugged the phone into a Cellbrite device, and on the phone itself, it showed where that phone had been in the device locations. Any one of us can take our phone right now, I did it before argument, and look up under the privacy settings, and it tells you... Well, one of the problems I have in this case is, and I want you to tell me what happened in this case, because he did say that he parsed the information and analyzed it, kind of like presented himself as an expert to the jury, and I understand the defense to be arguing that that's what the government had originally intended, is to proffer him as an expert witness, and then, of course, the disclosures weren't complied with, and then, you know, really, on the eve of calling the witness, the government then says, okay, well, we'll solve the problem by not tendering him as a witness and just focusing on the mechanics of it. It got a little slippery. So back up and tell me what happened. How did it play out this way? Certainly. I think that's largely accurate. He was an expert. He was intended to be called as an expert, and we realized that we didn't turn over the CD. I beg your pardon? The government realized it had not turned over the CD and sort of decided to present him as a lay witness at trial. Yeah, and he prepped him up as an expert, and so that's why it got slippery, because he proffered himself almost as an expert. Is that a fair characterization of the record? I think certainly his description of the word parsing is confusing and suggests more expertise than what he actually was doing. If you look, what he actually meant when he was saying parsing, as the testimony continued, he said that he parsed the contacts list, which is a straightforward thing that would be on someone's phone, who your contacts are. He said he parsed the log entries showing who called who. Again, basic things that are on the phone. And as I mentioned, even the device locations is, you know, I wasn't aware of this, but it's something that's on your phone, and it can tell you where that phone was in the weeks leading up to the arrest of Mr. Rama. So, however he described the word parsing, what he in practice was saying in his testimony was I plugged this phone into a Cellbrite machine, and it spit it out in a reader-friendly fashion, and here are three specific items that I got off of that phone. That was the extent of it. And this court, as Your Honor noted, in Obies and McLeod and a number of unpublished opinions has held that that type of straightforward Cellbrite testimony does not require expert certification. It's unpublished, though. I mean, I could plug in the phone myself, and the same report would be produced, but I'm not sure that I would know, just as a layperson, you know, how to get the coordinates and translate it into a map and then testify about the location. Does that require some expertise or at least some background knowledge that the average layperson wouldn't have? Your Honor, maybe it's a closer question than a pure text message, but in this case, based on what Agent Adasi testified to, we believe that the court was at least within its discretion. It wasn't illogical or implausible for the court to consider that pulling device locations off of a phone, plugging them into Google Maps or whatever to show where those points are on the map is something that doesn't require technical or scientific knowledge, that it's sort of within the realm of what all of us could do on our own, and that it was not an abuse of discretion to... Mr. Zipp, if I can just pick up on Judge Wynn's question, make sure I understand this. Essentially, the government's going to call him as a witness, and the defense objected saying there's been no disclosure in terms of expert testimony, and then the government said we're just offering him in terms of a lay witness in terms of certain facts and will not elicit expert testimony. That was the representation to the court, correct? Correct. All right, and so then he proceeds to testify, as I understand it, as to his training to analyze data, how he interpreted the data, how it's stored in a database, which is not necessarily accessible by the public, but then getting more specifically in the area of what would appear to be expertise testimony, how he translated the digital code into GPS coordinates and then mapped those coordinates and established proximity to Mr. Jimenez's workplace. That's in fact what was proffered in the case, correct? Yes, Your Honor, although... What I'm just rolling through here to give you an opportunity to respond, starting with the Carpenter case by the Supreme Court in 2018, referencing Justice Kennedy's dissent in terms of expert testimony about self-cite records that have proximity, the 7th Circuit in United States v. Hill, the 11th Circuit in United States v. Sebelveda, the 5th Circuit in United States v. Schaeffer, the 6th Circuit in United States v. Withers, the 10th Circuit. The cases are legion that deal with this precise issue over cell phone data and location and the importance of location, and the reason I'm being a little bit intense on this is it seems the one circuit who hasn't been that specific is the circuit from which I come, the 4th Circuit, and it was my case, and there I admitted the evidence because it had to do with what the content was, but not what the import of the content was, and the 4th Circuit drew a very careful line in the cases involving defendants named Graham and Jordan, and so I must confess that I'm just troubled by the fact that this case has not seen the least bit unique to me in terms of what occurred here, and overwhelmingly, U.S. Attorney's offices across the country know to disclose that and deal with it, and the defense has an opportunity to challenge it in some way. Sometimes they call their own expert to question the validity of the data or the reliability, and I'm troubled by this, that it doesn't seem to be particularly unique here, and Adasi appears to have done exactly what all these experts always do in all of these cases under the ambit of Rule 702, and all of them many times require a dalbert hearing ahead of time if there's the appropriate notice given by the government. Again, Your Honor, I think there's a key factual distinction between the cell site data in those cases and what Agent Adasi did in this case. And how so? Those cases, that would be the equivalent of, in this case, if we had no Cellebrite testimony at all, and all we presented was the agent saying, we have his phone number, we subpoenaed the carrier, and we got the cell site data showing where the pings were through the carrier. But you still have, I don't mean to corrupt, I'm trying, because I'm trying to get to the court, but give you an opportunity to respond, but it still comes out to the matter of that data and being translated to GPS coordinates, and then from there, going to the proximity and mapping out, you know what I'm talking about, the map, and it'll show the different towers in different parts of the city and the proximity, and it appears here, in this case, that the testimony was offered to say, ah, and here, this cell tower is in proximate position with the workplace that Mr. Heman is, and that goes to support the presentation of the government case. Isn't that what happened here? No, Your Honor, respectfully, there was no discussion of cell towers or anything related to that. There was, the end result was a map showing where the phone was, but that was simply pulling the device location off of the phone through Celebrite and plugging that into Google Maps and showing where the device from the phone showed on the map. It's mapping out the coordinates, though, correct? That's what was on the phone, which coordinates it was at, but that's different than the sort of expert testimony that would require explaining how cell towers work and how you're able to trace it versus on which third of the tower it was facing. None of that came into evidence, and that's entirely separate. It's GPS data. He only, he limited his testimony to GPS data? Yes, that's what shows up on the phone when you put device location, where has this phone been, find my iPhone, whatever it is, it will tell you where it was from the phone directly without the carriers, without cell towers, without any of that, and that's what the agent did here, and that's the sort of straightforward, non-technical testimony that this court is suing. And my understanding is the agent didn't actually do any analysis. The phone gets plugged into the program. He does something to say, I want the GPS data off this phone, and he tells the program that, and then the program spits out a report that says, here's the GPS coordinates for where the phone was on X date. That's my understanding. It pulls up a list.  And that's the extent of what he did. It's, as Your Honor said, similar to an MRI or a Xerox machine. You don't have to get into the how it works or how reliable it is. In his experience as an agent using this repeatedly, he has seen that plug in a phone and the results come out, and that's sort of straightforward, non-technical. Plug in a phone, get a report, the report has the GPS location, cut and paste that into Google Maps. Correct. Print out the map, present it to the jury. Yes. And that's far different from the cell tower. There was a question that Judge Forrest asked about preserving an objection to the reliability. Why isn't the 702 objection enough to trigger notice to the court that the court has to fulfill its function, responsibility of testing the reliability of the information that the agent is going to testify to? I think if you look at what was actually objected to in this case, the defense counsel objected that they hadn't received a CV for this witness. And then the United States responded that we're only going to offer him as a lay witness. The court confirmed, said, so he's just going to say he plugged it in and got the results. And we said yes. I think the court even asked, are you okay with that? Are you good with that? The defense counsel said yes. And then we proceeded with the testimony. Each time we put in the evidence that came from the phone, there was no objection. In fact, the court asked any objection, and there was no objection to each of those three pieces of evidence that came in, the log entries, the device locations, and the contacts list. So there was nothing in the record that would support that there was some sort of challenge to the reliability of the Cellebrite testimony in this case. It was entirely focused on the failure to turn over the CV at the outset. My understanding is we have a sort of a decent number of unpublished decisions, primarily from the district courts and multiple district courts, dealing with Cellebrite specifically and concluding that something similar to what happened here is fine, so long as the agent is only talking about, I used Cellebrite, and this is the report that I got from it, and not talking about the mechanics of how it works or the reliability, as we've been talking about. But that's not expert testimony. Is there any published cases that have gone that far? Not in this circuit. There's three unpublished, as you noted. The First Circuit has published on the issue in Montoya-Maisonette, which is cited in my brief. That's the only case I'm aware of that has published on the issue. Are you aware of cases, even unpublished cases, going the other way when Cellebrite testimony is limited to, I used Cellebrite, this is the report I got? I'm not aware of any. Some of the unpublished decisions in this case did not ultimately reach the issue. They talked about how it wasn't technical and then held that it was ultimately harmless, so they weren't going to reach it. But I'm not aware of any cases that have gone the opposite way and said that Cellebrite does require expert testimony. Mr. Zip, correct me if I'm wrong, Rule 701 was in fact amended in 2000, about two years before this Court's opinion, United States v. Finley. And the advisory committee notes to that note that essentially it was amended to eliminate the risk that reliability requirements set forth in Rule 702 will be evaded through the simple expedient process of proffering an expert in lay witness clothing. And following those amendments in 2000, it appears to be pretty clearly in the Finley case by this Court in 2002, lay testimony is that where the observations are within the common knowledge of the average layman. That's the standard, is it not? Yes, Your Honor. Now is it within the common knowledge of the average layman with respect to digital coding, storing in a database, translating the digital coding into GPS coordinates, and then mapping those coordinates in terms of proximity, is that in the common knowledge of the average layman? Your Honor, what Agent Adoskey testified to here was within the common knowledge of a layman. That you have a phone, you plug it into a system that you use regularly to spit out a report, and that shows where that phone has been because of the information on the phone, and you plug that into Google Maps and it shows where it's gone. None of that requires expert testimony. Well, I guess if we get down to the question in terms of the testimony crosses into expert testimony, again, according to this Court's opinion in United States v. Figueroa Lopez. Now, admittedly, that was in 1997 when there was a clear amendment in 2000 to Rule 701 to deal with this precise problem. And the advisory notes clearly reflect that that was the problem that was being addressed, trying to translate it into lay testimony, was it crosses into expert testimony when the witnesses' observations require demonstrable expertise. Now, that was this Court's holding in 1997, even three years before the amendments. Wouldn't it have been a better process when the Defense Counsel objected to this, for at minimum for the Court to take a recess and to go over whether or not it had not been properly disclosed and what the ambit of it would be, or even given the Defense Counsel an opportunity to be aware of trying to have other expert testimony be offered to proffer? Because that's what's being lost here, I think. In many of these cases, you not only have the government expert mapping out the coordinates, sometimes, not always, you have Defense Counsel able to present their expert, its expert, his expert, to challenge that. Wouldn't that have been the better process here? Your Honor, on the facts of this case, I don't believe that that was necessary. Well, once we put forth the agent originally as an expert to testify about a range of things that he pulled off the phone, internet searches, other things that wouldn't be accessible through sort of layperson-celebrant testimony. Once the Court said, you're just going to have him testify what he plugged in and what he got off the phone, and the Defense had no objection to that at any point afterwards, there was not a requirement for sort of a full-blown Daubert hearing and further... I know you're about over time, but can you briefly address the sentencing issue, the minor role analysis by the District Court? Sure. The District Court in this case did not abuse its discretion in finding that this defendant was not substantially less culpable than the average participant in the offense. The Court methodically went through all five of the factors that this Court identified in Quintero-Leva. It found that some of them weighed in favor of minor role, some of them were neutral, some of them weighed against minor role, and ultimately, after considering all of them, it determined that this defendant, given the fact that he admitted that he had crossed drugs 13 prior times, that he was paid what amounted to tens of thousands of dollars, that he knew the sort of highest levels of the drug organization, the owner of the drugs he was personally involved with. If we find that the District Court erred in its analysis of minor role, should that be remanded for sentencing? Your Honor, I think the error that the defense has identified is that the Court didn't conduct the sort of mathematical average discussion from this Court's subsequent case in Dominguez-Caicedo that came out after this case. It's our position that the Court need not remand on that issue, that the sort of procedural error that the Court did its comparison wrong, that even if the Court had sort of explicitly stated that it was comparing the individuals in this offense, that ultimately those five factors from Quintero-Leyva still firmly support a grant of minor role. And the Court did, at the outset, acknowledge that it had read the defense briefs, which outlined the different parties that were involved. And as Your Honor noted, throughout its process, it was talking about others involved on both sides of the border and comparing this defendant's role to those. So to the extent that the error is not applying the proper comparison under Dominguez-Caicedo, it's our position that that does not require remand. On a broader level, if the Court determines that minor role should have been granted in this case, then we would concede that it would need to come back down for resentencing because it wouldn't be clear whether the sentence would be granted. But we don't usually engage in that analysis of figuring out, well, should or should not have done. Usually, there's an error, it's the wrong starting point, we send it back on an open record. Understood. And Dominguez-Caicedo certainly came out after sentencing was complete in this case, but it's our position that the specific error that the Court committed here would not have changed the outcome, even if it had conducted a more focused comparison to the individual defendants in this case. Okay. Thank you very much. Thank you. Thank you. I'll pick up briefly just on minor role and then go back to Agent Adasi. So on minor role, I think had the Court conducted the correct approach, it very well could have changed the outcome here, and I'll point just to the value of the drugs as an example. So there the Court said, the Court recognized that Mr. Jimenez was not paid a significant portion of the ultimate value of the drugs. However, the Court said, I don't find that determinative because he was paid more than other kinds of couriers I've seen in other kinds of cases. So that's an example where just the difference in the starting point really may have affected the outcome on minor role here. As to Agent Adasi, I'll say there is, we cited in our brief, United States v. Wuerl, which is a published Seventh Circuit case. That's a case that discussed why a discussion of forensic extraction software is subject to Rule 702. It doesn't name Cellbrite as a specific software, but it's clearly a similar type of software. Right. But I don't know that he discussed the software. He testified to the mechanics of what he did in terms of plugging it in and having the report... Based on... It's hard to... Yeah. But I agree with you. Any discussion of software would really be in the realm of expert testimony. And I think here, Agent Adasi got pretty close to that line, and it's a little... What exactly that line is, is tough, but I think here, Agent Adasi got pretty close. On the point about objections, so we did object under Rule 702 once Agent Adasi started talking about specifics at several points during his testimony. So this is an issue where the issue is preserved. I just wanted to point that out. I guess I'm... Let me follow up on that. My reading of the transcript was similar, as outlined by the government, that he comes in as a witness, and several of the Cellbrite report pages, or whatever, come into evidence without objection. What I understand the reliability argument to be would be an attack on Cellbrite, and how reliable that is as a software system. If that's the nature of the argument, wouldn't that need to be made as these reports are coming in? Why would you have waited? And I know it's not you, but why would defense have waited until we're way down that road and Cellbrite is already in, and jury is thinking about it without objection? I believe we objected before, under 702, before those specific... I think the order of operations was, we said, objected under Rule 702, government said, it's fine, we just plugged it in, and we say, okay, if that's all, fine. Right, but in that moment, if the argument is reliability, Cellbrite isn't reliable, then why would you say, okay, that's fine? You would say, I still have my objection. I think that Cellbrite has reliability problems, and that needs to be addressed. Our objection wasn't that Cellbrite is unreliable, it's that this specific database of frequently visited locations was not something we were familiar with, or had specialized understanding of in terms of how reliable that was. It's something that does require specialized information, and so when that was raised during the course of this testimony, that's when we objected. Was there any argument either by the prosecution or by the defense in closing about reliability of the location data? Well, so, sort of. So the prosecutor says in closing that this location data was important for the jury to take their testimony because there's no way for him to know about this. This is just an entry in the phone none of us would ever see unless somebody did a deep dive like this. So emphasize the importance of it and the specialized nature of it as an important independent corroborating piece. All right, thank you very much. Thank you. You're over time, but we really appreciate both sides' very helpful arguments today. Thank you very much. The matter is submitted.
judges: NGUYEN, FORREST, Bennett